**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4896

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON LASHON INGRAM, a/k/a Brandon Lashun Ingram, a/k/a Little B, a/k/a B,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:12-cr-00020-BR-1)

Argued: December 12, 2013              Decided: February 19, 2014

Before TRAXLER, Chief Judge, and DIAZ and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Walter Hoytt Paramore, III, THE LAW OFFICES OF W.H. PARAMORE, III, P.C., Jacksonville, North Carolina, for Appellant. Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Brandon Lashon Ingram was found guilty of conspiring to distribute and possess with the intent to distribute cocaine base and cocaine. Ingram now challenges his conviction on evidentiary grounds, contends that the district court should have granted his pro se motion to dismiss his attorney, requests a new trial due to ineffective assistance of counsel, and argues that his sentence is unreasonable. For the reasons that follow, we affirm the district court's decisions and decline to grant Ingram's request for a new trial.

I.

On January 24, 2012, Ingram was charged in a six-count indictment with knowingly and intentionally conspiring to distribute and possess with the intent to distribute at least 280 grams of cocaine base (crack cocaine) and a quantity of cocaine from September 2009 to December 2011 in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); using and carrying a firearm during a drug-trafficking crime in violation of 18 U.S.C. § 924(c) (Count Two); knowingly and intentionally distributing cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts Three through Five); and knowingly and intentionally distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count Six).

2

On four occasions in November and December 2011, confidential informant Britt Jaynes made controlled purchases of cocaine and crack cocaine from Ingram. These purchases were the bases for Counts Three through Six. Officers arrested Ingram at a residence on January 6, 2012. They surrounded the home, which had many people inside, and used a public address system to order Ingram to exit the building. Detective Jeff Wenhart of the Fuquay-Varina, North Carolina, Police Department testified that he could see Ingram running around inside the house, which was filled with marijuana smoke. After Ingram surrendered, officers searched the home and found baggies, marijuana blunts, a gun, and a digital scale. They also saw evidence that someone had flushed drugs down the toilet. On Ingram's person, officers found a plastic baggie, $100 in cash, and a folded one-dollar bill with cocaine inside.

Following his arrest, Ingram asked why he had been arrested. Officer Brett Walsh told him that he was arrested due to his involvement in a drug conspiracy. Ingram replied, "You know, it's not me. I am not a big time guy. I am not big time. You got the wrong guy. I am not the big dealer. . . . You know, I am just a quarter man," or a small-time drug dealer. Later, he told Detective Wenhart, "You all are making me out bigger than I am. I am not the big guy you think I am." Although Detective Wenhart testified that he read Ingram his Miranda

3

rights prior to interviewing him at the police station, the record is unclear as to whether anyone informed Ingram of his Miranda rights prior to his earlier conversation with Officer Walsh. In response to a question from Ingram's attorney, Officer Walsh testified that Ingram initiated their exchange.

On May 10, 2012, the government filed a notice of intent to use evidence of other crimes, wrongs, or acts. In the notice, the government announced its intention to present evidence of a December 22, 2005, incident in which Ingram brandished a firearm during an encounter with United States Marshals, who later found him in possession of 1.5 grams of crack cocaine and three grams of marijuana. A footnote in the notice also mentioned the following four incidents and identified them as evidence that the government planned to introduce at trial. First, during an attempt to evade Fuquay-Varina police officers on June 3, 2010, Ingram ran away on foot after driving his vehicle onto a dead-end street. Second, on June 19, 2010, Ingram crashed his car into a tree and ran away on foot while he fled from Holly Springs, North Carolina, police officers. Police officers later found cocaine, marijuana, a digital scale, and a gun in his vehicle. Third, while fleeing from state law enforcement officials on February 24, 2011, Ingram drove over 100 miles per hour in a zone with a thirty-five-mile-per-hour speed limit and struck a law enforcement vehicle. An officer found $2,857 in

4

cash in Ingram's pocket after officials apprehended him.[1] Fourth, when co-conspirator Steven Dennis warned Ingram not to carry scales, drugs, and a firearm in his car, Ingram replied, "[I]t does not matter, I just run from the police anyway."[2] On May 25, 2012, the government also filed a motion for an order to disclose Ingram's tax returns at trial, arguing that the tax returns showed a discrepancy between Ingram's reported income and his expenditures for cars, guns, and drugs.

The district court issued its rulings regarding the notice of intent to use evidence of other crimes, wrongs, or acts and the motion for an order to disclose Ingram's tax returns on June 4, 2012. The court excluded the December 22, 2005, arrest because it fell outside the conspiracy's time frame—September 2009 to December 2011—but permitted the government to admit the incidents that fell within the time period of the conspiracy. The court also allowed the government to admit evidence of Ingram's tax returns from 2009 and later.

Ingram's trial took place from June 5 to June 8, 2012. The government's case included testimony from three co-conspirators:

---

[1] Although the fact that officers found cash in Ingram's pocket during this incident appears in the record, the government did not include this information in the notice.

[2] During his testimony at trial, Dennis paraphrased Ingram slightly differently: "He said that he didn't—it didn't matter because he was going to run from the police anyway."

Mario Jones, Terrill Owens, and Dennis. Jones began dealing crack cocaine in 2006 or 2007 in Fuquay-Varina and engaged in three drug deals with Ingram, at least one of which took place at the home of Kino Wooten. Jones also witnessed Ingram selling drugs to others at least ten times. Owens met Ingram at Wooten's home in 2010, when Owens, Wooten, and Bruce Douglas each purchased five grams of crack cocaine from Ingram. In subsequent drug deals, Owens purchased twenty-eight grams of crack cocaine from Ingram, and Owens and Douglas each purchased fourteen grams of crack cocaine from Ingram. Owens testified that, during the latter deal, Ingram was carrying a firearm. Owens also witnessed Ingram selling drugs on at least two other occasions. Dennis met Ingram at Wooten's home in late 2009, when Ingram purchased one gram of cocaine from Dennis. In late 2009 or 2010, Dennis accompanied Ingram to a Wal-Mart, where Ingram sold a customer 3.5 grams of crack cocaine. Dennis testified that, in July 2010, Ingram brandished a firearm and stole 4.5 ounces of crack cocaine from him. Dennis saw Ingram sell crack cocaine about ten times—usually at Wooten's home—and told law enforcement officials that Ingram was "supplying the vast majority of people in Fuquay-Varina." Based on Jones's, Owens's, and Dennis's testimonies alone, Detective Wenhart calculated that Ingram had distributed and possessed with the

6

intent to distribute 295 grams of crack cocaine and one gram of powder cocaine.

The government's case also referred to the following two incidents. On January 27, 2010, officers arrived to assist Ingram after he was shot in the hip while driving his vehicle. As Officer Randall Packard of the Durham, North Carolina, Police Department helped Ingram, he noticed several bags of drugs in the car, containing marijuana, cocaine, and crack cocaine. A search also revealed a folded one-dollar bill containing cocaine, a marijuana blunt, a digital scale, and $1,670.03 in cash. On September 2, 2011, Officer Mitchell Ham of the Holly Springs Police Department pulled over Ingram and smelled marijuana. Ham arrested Ingram and searched the vehicle. During the search, Ham found a marijuana blunt, a scale containing cocaine residue, 0.1 grams of cocaine, a one-dollar bill with white powder on it, two cellular telephones, and $238 in cash.

After the government rested, Ingram moved for acquittal under Federal Rule of Criminal Procedure 29(a). The district court denied Ingram's motion. The jury then returned a verdict of guilty on Count One and Counts Three through Six and a verdict of not guilty on Count Two. On August 8, 2012, Ingram filed a pro se motion to dismiss his attorney. The district

7

court held a hearing on the motion on September 4, 2012, and denied Ingram's motion.

In the Presentence Investigation Report (PSR), a probation officer assigned Ingram a base offense level of 32 because he was responsible for the cocaine equivalent of at least 1000 kilograms but less than 3000 kilograms of marijuana. To this base offense level, the probation officer added two levels for possession of a firearm, two levels for use of violence or making a credible threat to use violence, two levels for maintaining premises for the purpose of manufacturing or distributing a controlled substance, and two levels for recklessly creating a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement officials. These additions brought Ingram's adjusted offense level to 40. Ingram's career offender status placed him in criminal history category VI, resulting in a Sentencing Guidelines range of 360 months' to life imprisonment for Count One and 240 months' imprisonment for Counts Three through Six.

Ingram objected to the PSR on the basis that the probation officer should not have included 127.58 grams of crack cocaine that he stole from Dennis in his drug amount total. The district court addressed this argument during Ingram's sentencing hearing on November 5, 2012. The court found that a

8

preponderance of the evidence demonstrated that Ingram had robbed Dennis, and it adopted the PSR's factual findings and Guidelines recommendation. The court then sentenced Ingram to 360 months' imprisonment for Count One and 240 months' imprisonment for Counts Three through Six, to run concurrently.

Ingram filed a timely notice of appeal. On appeal, Ingram challenges his conviction on evidentiary grounds, contending that (1) the evidence was insufficient to prove that he conspired to distribute and possess with the intent to distribute at least 280 grams of crack cocaine and (2) the district court abused its discretion by admitting evidence of his tax returns and attempts to evade law enforcement. Ingram also asserts that the district court should have granted his pro se motion to dismiss his attorney, he is entitled to a new trial due to ineffective assistance of counsel, and his sentence is procedurally unreasonable. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

We turn first to the question of whether the evidence was sufficient to prove that Ingram conspired to distribute and possess with the intent to distribute at least 280 grams of crack cocaine and a quantity of cocaine. When an appellant claims that the evidence was insufficient to support his or her

9

conviction, we "must uphold a jury verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support it." United States v. Cardwell, 433 F.3d 378, 390 (4th Cir. 2005). Substantial evidence is evidence that "a 'reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). Ingram contends that the evidence is insufficient to prove the conspiracy charge for two reasons. First, he argues that "there was no evidence offered that co-conspirators[] Jones, Owens, and Dennis had any drug[-]related relationship," or, "[i]n other words, there is no evidence in the record that Mario Jones, Ter[r]ill Owens, and Steven Dennis had sold drugs to one another." Second, Ingram asserts that the evidence shows he was responsible for only 275.3 grams of crack cocaine, not at least 280 grams.

To prove conspiracy, the government must "establish beyond a reasonable doubt that (1) an agreement to distribute and possess cocaine [and crack cocaine] with intent to distribute existed between two or more persons; (2) [Ingram] knew of the conspiracy; and (3) [Ingram] knowingly and voluntarily became a part of this conspiracy." United States v. Hackley, 662 F.3d 671, 678-79 (4th Cir. 2011) (quoting United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008)) (internal quotation marks

10

omitted). Although a "knowing and voluntary agreement" is an element of the crime of conspiracy, conspirators need not know "all of the details of the conspiracy" as long as they know the conspiracy's "essential object." Id. at 679 (quoting United States v. Goldman, 750 F.2d 1221, 1227 (4th Cir. 1984)) (internal quotation marks omitted); see also Burgos, 94 F.3d at 858 ("[A] defendant properly may be convicted of conspiracy without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, . . . even though he played only a minor part." (second alteration in original) (quoting United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989))). "Evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction." Hackley, 662 F.3d at 679 (quoting United States v. Townsend, 924 F.2d 1385, 1394 (7th Cir. 1991)) (internal quotation marks omitted). However, "evidence of a continuing buy-sell relationship when coupled with evidence of large quantities of drugs, or 'continuing relationships and repeated transactions,' creates a reasonable inference of an agreement." Id. (quoting United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008)).

Contrary to Ingram's assertions, the government did not need to prove that Jones, Owens, and Dennis "had sold drugs to

11

one another"; the government simply needed to show that Ingram knew the conspiracy's essential object—distributing and possessing cocaine and crack cocaine—and voluntarily agreed with other people to participate in the conspiracy. According to Jones's, Owens's, and Dennis's testimonies, Wooten allowed Ingram to repeatedly distribute cocaine and crack cocaine from his home. Jones and Owens also testified that they engaged in or witnessed multiple drug deals involving Ingram, and Owens and Dennis indicated that Wooten purchased drugs from Ingram on multiple occasions. In light of this evidence, Ingram's argument that the evidence was insufficient to show that Ingram knowingly and voluntarily agreed to participate in a drug distribution and possession conspiracy lacks merit.

Ingram also avers that the evidence was insufficient to support a finding that he conspired to distribute and possess with the intent to distribute the amount of crack cocaine in question: at least 280 grams. Citing the PSR's findings, which the district court adopted for sentencing purposes, Ingram argues that he is accountable for distributing and possessing with the intent to distribute only 275.3 grams of crack cocaine. Detective Wenhart indicated that Ingram had distributed and possessed with the intent to distribute 295 grams of crack cocaine and one gram of powder cocaine as part of the

12

conspiracy.[3]  Viewed in the light most favorable to the government, this testimony supports the jury's conclusion. Furthermore, the fact that the district court deviated from the jury's determination for sentencing purposes does not indicate that the evidence was insufficient to support the jury's verdict.  As this Court held in United States v. Young, 609 F.3d 348 (4th Cir. 2010), "beyond establishing the maximum sentence, the jury's drug-quantity determination place[s] no constraint on the district court's authority to find facts relevant to sentencing," id. at 357.  Because the jury's conclusion that Ingram was responsible for at least 280 grams of crack cocaine did not constrain the district court's sentencing determination, we decline to assume that the district court's finding implies any weakness in the jury's assessment.  We therefore hold that the evidence was sufficient to prove that Ingram conspired to

---

[3] During his testimony, Officer Wenhart determined that Ingram participated in transactions involving 296 grams of drugs, but he did not specify whether the 296-gram total included only crack cocaine.  Officer Wenhart reached this amount by converting the drug quantities Jones, Owens, and Dennis mentioned during their testimonies from ounces to grams and adding the figures together.  Although Officer Wenhart did not consistently specify whether the quantities in question referred to crack cocaine, Jones, Owens, and Dennis each supplied this information during their testimonies.  Cross-referencing Officer Wenhart's testimony and Jones's, Owens's, and Dennis's testimonies allowed us—and, presumably, the jury—to determine that the 296-gram total included 295 grams of crack cocaine and one gram of powder cocaine.

distribute and possess with the intent to distribute at least 280 grams of crack cocaine and a quantity of cocaine.

## III.

Next, we consider Ingram's second evidentiary argument: that the district court erred by admitting evidence of his tax returns and attempts to evade law enforcement under Federal Rule of Evidence 404(b). "Rule 404(b) limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence of intrinsic acts." United States v. Lighty, 616 F.3d 321, 352 (4th Cir. 2010). Acts are "intrinsic" when they are "inextricably intertwined [with the charged crime] or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." Id. (quoting United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996)) (internal quotation marks omitted). "[E]vidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." Id. (alteration in original) (quoting United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007)) (internal quotation marks omitted). For acts that do not qualify as "intrinsic," this

14

Court outlined a test for determining admissibility under Rule

404(b) in United States v. Queen, 132 F.3d 991 (4th Cir. 1997):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

Id. at 997. We generally review decisions regarding the

admissibility of evidence for abuse of discretion. Id. at 995.


A. Tax Returns

Although Ingram challenged the admissibility of the tax

returns on the basis of Federal Rule of Evidence 403 below, he

raises his Rule 404(b) argument for the first time on appeal.[4]

We therefore review the district court's decision to admit the

evidence for plain error. United States v. Bernard, 708 F.3d

583, 588 (4th Cir. 2013). Under the plain error standard, we

may—but are not required to—correct the district court's error

---

[4] The government contends that the tax returns do not relate to a prior bad act, rendering Ingram's Rule 404(b) argument inappropriate. However, because the government used the tax returns as evidence that Ingram had misstated his income, the returns implicate a bad act and Rule 404(b) applies.

15

if the error was plain and affected Ingram's "substantial rights." United States v. Olano, 507 U.S. 725, 732, 735 (1993).

Assuming for the sake of argument that Ingram's misrepresentations regarding his income were not intrinsic to the conspiracy charge, we turn to the Queen test. First, the government sought to admit the tax returns to show that Ingram's "financial means far exceeded his legal income," indicating that he had income from other sources—such as drug sales—which he purposefully hid. The tax returns were therefore relevant for non-character purposes, such as proving Ingram's knowledge of the conspiracy and his absence of mistake in participating in it. See United States v. Grandison, 783 F.2d 1152, 1156 (4th Cir. 1986) ("It is clear that evidence of unexplained wealth is relevant in a narcotics prosecution as evidence of illegal dealings and ill-gotten gains."). Second, the tax returns were "probative of . . . an element of the offense." Queen, 132 F.3d at 997. As we explain above, knowledge of the conspiracy and voluntary participation in it are elements of the offense in this case, see Hackley, 662 F.3d at 678-79, and, as we note earlier in this paragraph, the tax returns certainly speak to these elements. The third Queen factor—the evidence's reliability—is not at issue on appeal. We therefore turn to the fourth Queen factor: whether the "evidence's probative value . . . [is] substantially outweighed by confusion or unfair

16

prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." Queen, 132 F.3d at 997. After hearing Ingram's argument that the tax return evidence was highly prejudicial because it would cause the jury to assume that Ingram was a drug dealer, the district court found that the probative value of the tax returns from the time period of the conspiracy outweighed their prejudicial effect. In light of the bearing that the tax returns have on Ingram's knowledge of, and voluntary participation in, the conspiracy, we agree with the district court's assessment and conclude that the fourth Queen factor does not bar the evidence. Accordingly, we hold that the district court did not err—much less plainly err—under Rule 404(b) by admitting the tax returns.

## B. Flight Evidence

Ingram also challenges the district court's decision to admit evidence of his attempts to escape law enforcement officials. The June 3, 2010, June 19, 2010, and February 24, 2011, incidents each involved Ingram fleeing from law enforcement officials. Officers found drugs, a digital scale, and a gun in his vehicle during the June 19, 2010, incident, and they found cash on his person during the February 24, 2011, incident. At some point, Ingram told Dennis that "it d[id] not matter" that he kept scales, drugs, and a firearm in his car

17

because he "was going to run from the police anyway."[5]  Based on this statement and Ingram's behavior, the government sought to establish that fleeing law enforcement officers was Ingram's strategy for preventing them from discovering the drugs and drug paraphernalia that he habitually kept in his vehicle.

All of the incidents in question occurred during the time period of the conspiracy and illustrated Ingram's self-proclaimed method of preventing the police from discovering evidence of his drug possession and distribution—in other words, evidence of the conspiracy.  Because the flight incidents and statement were "part of [the] single criminal episode" that constituted the conspiracy, they are intrinsic to the conspiracy charge and fall outside Rule 404(b)'s ambit.  See Lighty, 616 F.3d at 352; see also United States v. Dozie, 27 F.3d 95, 97 (4th Cir. 1994) (per curiam) (holding that Rule 404(b) did not apply to allegations of insurance fraud that occurred within the same time frame as the charged conspiracy to commit mail fraud).  Consequently, the district court did not abuse its discretion by allowing the government to introduce this evidence.

---

[5] Dennis did not specify when this conversation took place, but we assume it occurred between late 2009 and July 2010. Ingram and Dennis met in late 2009, and the two men stopped associating with each other after Ingram robbed Dennis in June or July 2010.  Ingram therefore presumably made the statement during the time frame of the conspiracy.

IV.

In addition to making these evidentiary arguments, Ingram contends that the district court erred by denying his motion to dismiss counsel. We review district courts' decisions to deny such motions for abuse of discretion. Hackley, 662 F.3d at 685. In doing so, we consider "(1) 'the timeliness of the motion'; (2) 'the adequacy of the court's inquiry into the defendant's complaint'; and (3) 'whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.'" Id. (quoting United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994)).

We turn first to the timeliness of Ingram's motion. This Court typically deems such a motion to be untimely when the defendant files it days before trial or the motion "proceeds from a transparent ploy to bring about delay." Compare id. (affirming denial of motion filed one week before trial), and United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988) (affirming denial of motion filed five days before trial), with United States v. Watkins, 153 F. App'x 201, 202 (4th Cir. 2005) (noting that motion filed more than a month prior to sentencing was timely). Ingram filed his motion to dismiss counsel on August 8, 2012—nearly three months before sentencing. Furthermore, neither the motion itself nor the district court's motion hearing suggest that Ingram filed the motion to delay his

19

sentencing hearing. We therefore conclude that the first prong of the above test weighs in Ingram's favor.

Ingram does not challenge the adequacy of the district court's inquiry into his complaint, which, as we describe below, was quite thorough. We therefore turn to the third prong of the above test: whether Ingram's conflict with his attorney was so great that it resulted in a communication breakdown that prevented an adequate defense. Ingram contends that his conflict with his attorney warranted dismissing counsel for the following reasons[6]: (1) he was unable to reach his attorney via telephone on several occasions because his attorney's office did not accept collect calls, (2) he did not hear from his attorney between the trial and his interview with the probation office, (3) defense counsel said he would remove himself from Ingram's case after sentencing, (4) defense counsel failed to introduce certain exculpatory evidence, although Ingram did not specify what that evidence was in his brief, in his motion, or during the hearing on that motion, and (5) defense counsel did not use Ingram's suggestions regarding what material to include in his closing argument.

---

[6] Ingram does not provide specific details regarding his lack of communication with his attorney in his brief. Instead, he refers to his motion and statements he made during the district court's hearing on that motion. We draw these reasons from those sources.

20

While addressing Ingram's arguments regarding whether a total breakdown of communication occurred and prevented an adequate defense, the district court noted that Ingram's attorney had obtained a not-guilty verdict on Count Two. The court further explained that defense counsel's failure to communicate with Ingram for twenty days after trial was understandable because defense counsel had no need to speak with Ingram until the PSR arrived. Additionally, the court determined that Ingram's attorney was "in the best position, now having tried [his] case, to help [him] through this critical part of [his] defense up until [his] sentencing." In response to Ingram's argument that defense counsel planned to stop representing him, the court explained that defense counsel could not remove himself from the case without the court's permission. Finally, the court noted that defense counsel was entitled to act contrary to Ingram's suggestions when crafting his closing argument to provide the best possible representation.

The record does not indicate that the communication issues Ingram describes had any impact on his defense. Accordingly, we have no reason to believe that the alleged communication lapses prevented Ingram's attorney from properly assisting him during the judicial proceedings in question. See United States v. Hanley, 974 F.2d 14, 17 (4th Cir. 1992) (discerning no total lack of communication preventing an adequate defense because the

defendant's lawyer properly assisted him during trial); Gallop, 838 F.2d at 109 (same). We therefore agree with the district court's assessment and conclude that Ingram's conflict with his attorney did not result in a total lack of communication that prevented an adequate defense. In light of the adequacy of the district court's inquiry and the absence of a meaningful communication breakdown between Ingram and his attorney, we hold that the district court did not abuse its discretion in denying Ingram's motion to dismiss counsel.

V.

Next, Ingram avers that his attorney provided ineffective assistance and asks us to grant a request for a new trial. Defendants may raise claims of ineffective assistance of counsel on direct appeal "only where the record conclusively establishes ineffective assistance." United States v. Baptiste, 596 F.3d 214, 216 n.1 (4th Cir. 2010). "Otherwise, the proper avenue for such claims is a 28 U.S.C. § 2255 motion filed with the district court." Id. To bring a successful ineffective assistance of counsel claim, Ingram must satisfy the two-pronged test that the Supreme Court established in Strickland v. Washington, 466 U.S. 668 (1984). Under that test, Ingram first "must show that his counsel's performance 'fell below an objective standard of reasonableness' in light of prevailing professional norms."

22

Lawrence v. Branker, 517 F.3d 700, 708 (4th Cir. 2008) (quoting Strickland, 466 U.S. at 688).  Second, Ingram must demonstrate that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

Ingram contends that his attorney's performance was deficient in the following ways:  (1) he failed to challenge Ingram's confession to being a drug dealer on constitutional grounds prior to trial via a motion to suppress; (2) he did not develop the issue of custodial interrogation by voir dire; and (3) he asked Officer Walsh if he had initiated the conversation during which Ingram confessed to being a drug dealer, and Officer Walsh answered, "No."  As we explain above, although Detective Wenhart testified that he read Ingram his Miranda rights prior to their exchange, it is unclear whether anyone informed Ingram of his Miranda rights prior to his earlier admissions to Officer Walsh.

Even if we assume for the sake of argument that Ingram can satisfy the first Strickland factor, his ineffective assistance of counsel claim fails under Strickland's second prong.  The record does not establish a reasonable probability that the trial's outcome would have been different if defense counsel had not committed the alleged errors.  Even without Ingram's

confession, the evidence against him was overwhelming. The government's case featured, among many other things, damaging testimony from multiple co-conspirators and testimony from an individual who conducted four controlled purchases of drugs from Ingram. We therefore conclude that the record on appeal does not conclusively establish ineffective assistance of counsel. Although we decline to grant Ingram's request for a new trial, we note that our determination does not affect Ingram's right to pursue relief under § 2255 should he choose to do so.

VI.

Finally, Ingram argues that his sentence is procedurally unreasonable because the district court drew part of the drug quantity it attributed to him from Dennis's testimony, which Ingram contends was unreliable. We evaluate sentences "under an abuse-of-discretion standard, which translates to review for 'reasonableness.'" United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2010) (quoting United States v. Booker, 543 U.S. 220, 261-62 (2005)). "Sentences must be both procedurally and substantively reasonable." United States v. Crawford, 734 F.3d 339, 342 (4th Cir. 2013). We will vacate a sentence on procedural grounds if the district court "select[ed] [the] sentence based on clearly erroneous facts." United States v. Medina-Campo, 714 F.3d 232, 234 (4th Cir. 2013) (quoting Gall v.

24

<u>United States</u>, 552 U.S. 38, 51 (2007)) (internal quotation marks omitted).

Ingram avers that the district court erred in utilizing Dennis's testimony because (1) the testimony was unreliable due to Dennis's cooperation with prosecutors to obtain a reduced sentence and (2) no other evidence corroborated Dennis's account.  In other words, Ingram contends that the district court should not have attributed the drug quantity in question to Ingram based on Dennis's testimony alone because Dennis was not a credible witness.  However, "when a district court's factual finding is based upon assessments of witness credibility, such finding is deserving of the highest degree of appellate deference."  <u>United States v. Thompson</u>, 554 F.3d 450, 452 (4th Cir. 2009) (quoting <u>U.S. Fire Ins. Co. v. Allied Towing Corp.</u>, 966 F.2d 820, 824 (4th Cir. 1992)) (internal quotation marks omitted).  "[E]ven the testimony of a potentially biased witness is sufficient to support a finding of fact," and "the district court may credit testimony that is 'totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant." <u>United States v. Johnson</u>, 489 F.3d 794, 797 (7th Cir. 2007) (quoting <u>United States v. Romero</u>, 469 F.3d 1139, 1147 (7th Cir. 2006)) (internal quotation marks omitted); <u>see also</u> <u>United States v. Ramseur</u>, 378 F. App'x 260, 266 (4th Cir. 2010) (noting that the

25

district court can find facts for sentencing purposes based on statements from "convicted felons seeking a sentence reduction"). In light of this deferential standard, Ingram cannot successfully paint his sentence as procedurally unreasonable by attacking Dennis's testimony based on credibility alone. We therefore affirm Ingram's sentence.

## VII.

For the abovementioned reasons, we affirm the district court's evidentiary decisions, its denial of Ingram's motion to dismiss counsel, and Ingram's sentence. We also decline to grant Ingram's request for a new trial.

<u>AFFIRMED</u>

26