**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 13-4633**

─────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

  v.

FRANCISCO BARAHONA, a/k/a Poncho,

    Defendant - Appellant.

─────────────

**No. 13-4637**

─────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

  v.

NOE FARID MEDRANO,

    Defendant - Appellant.

─────────────

**No. 13-4822**

─────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

  v.

OMAR STEELE, a/k/a Panamanian, a/k/a Omie,

Defendant - Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:12-cr-00014-RWT-3; 8:12-cr-00014-RWT-7; 8:12-cr-00014-RWT-5)

---

Argued: March 25, 2015                    Decided: April 24, 2015

---

Before WILKINSON and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Affirmed by unpublished opinion. Senior Judge Davis wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

---

**ARGUED:** Kira Anne West, LAW OFFICE OF KIRA ANNE WEST, Washington, D.C.; Anthony Douglas Martin, I, ANTHONY D. MARTIN, PC, Greenbelt, Maryland; Elita C. Amato, Arlington, Virginia, for Appellants. Scott A.C. Meisler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Sujit Raman, Chief of Appeals, Deborah Johnston, Assistant United States Attorney, Mara Zusman Greenberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland; Leslie R. Caldwell, Assistant Attorney General, David A. O'Neil, Acting Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

These appeals arise from the prosecution of members of a conspiracy to distribute significant quantities of cocaine and heroin in Maryland and other states from 2010 to January 2012. At the center of the government's case was cooperating coconspirator Saul Calderon Mata, who obtained drugs from sources in Virginia, Georgia, Texas, and elsewhere, and then transported and distributed the drugs with the help of a network of associates, including Francisco Barahona, Noe Farid Medrano, and Omar Steele (all three, collectively, "the Defendants"). Following a multi-week trial, a jury convicted Barahona and Steele of conspiring to distribute more than five kilograms of cocaine and one kilogram of heroin. The jury also found Medrano guilty of conspiring to distribute more than five kilograms of cocaine. On appeal, the Defendants make several assertions of error, some individually and some jointly, regarding pretrial rulings, their trial, and the application of a sentencing enhancement. Having carefully considered all of the Defendants' contentions, we discern no reversible error in any respect, and we therefore affirm.

## I.

### A.

Law enforcement began investigating Mata in September 2011. By then, Mata was active in the drug business, and had a

longstanding relationship with Barahona, who obtained cocaine from Mata to distribute to others and made supply runs on Mata's behalf. For example, Mata paid Barahona a fee of $1,000 per kilogram to make supply runs to Atlanta, Georgia. Barahona also rented Mata the basement of his Gaithersburg, Maryland home to store, cut, and repackage drugs.

Like Barahona, Medrano distributed drugs for Mata. Mata fronted Medrano ounces of cocaine at a time, and then collected payment from Medrano after he sold the drugs. In addition to distributing drugs, Medrano made supply runs on Mata's behalf, and arranged for one of his associates, Daniel Stotz, to make the Atlanta runs for the $1,000-per-kilogram fee, with $100 of that fee going to Medrano. Mata also bought handguns from Medrano and Stotz for his protection. By January 2012, Mata owed Medrano and Stotz $15,000, and as collateral for the debt, gave them large quantities of marijuana.

Steele was one of Mata's main customers for cocaine and heroin, and began buying kilogram quantities of those drugs in 2010. Some of those transactions took place at Steele's apartment on 16th Avenue in Hyattsville, Maryland, which Steele eventually agreed to lease to Mata. Mata used the Hyattsville apartment for about a month and a half, and during that time, continued to distribute cocaine and heroin to Steele at the apartment complex. On one occasion, while Mata was living in

4

the apartment, Steele served as a translator in a heroin deal between Mata and Steele's English-speaking friend. Steele's friend subsequently met Mata and one of his associates, Ivan Santoyo-Villa, at a restaurant with $50,000, to be used to buy cocaine and heroin from a supplier in Virginia. Shortly after Mata moved out of the Hyattsville apartment, Steele brokered a deal for Mata to sell a kilogram of heroin to a woman in New York. Steele later arranged for Mata to sell the woman an additional half-kilogram of heroin. Following this transaction, Steele and Mata continued to stay in contact regarding drugs Steele wanted, money that Steele owed Mata, and a digital scale that Steele wanted Mata to return.

## B.

In late January 2012, Mata sent Santoyo-Villa and Stotz to Atlanta to pick up five kilograms of cocaine and two kilograms of heroin, which would be concealed in a hidden compartment of a vehicle driven by Stotz. Before the drugs arrived, Mata contacted Barahona, who confirmed that Mata could cut and repackage the drugs in his basement and helped Mata locate the key to a room containing cutting materials. Mata also contacted Medrano to confirm that his order for eighteen ounces of cocaine would soon be ready, and Steele to find out how many kilograms of drugs he needed. Suspecting that police were following him,

5

however, Steele put off placing his order. Steele was later arrested by law enforcement agents following his car.

On January 25, 2012, Mata arrived at Barahona's house in the car that Stotz had driven from Atlanta. Mata and another of his associates, Alfonso Solorio, brought the drugs, except for one kilogram of cocaine which was stuck in the car's hidden compartment, to Barahona's basement. Soon thereafter, law enforcement agents entered the house with a search warrant. In the basement, agents found kilograms of cocaine and heroin in brick form, cutting agents, and various other materials containing drug residue or used to package drugs. Agents also recovered the remaining kilogram of cocaine from the hidden compartment in the car, and seized a firearm, which Medrano had sold to Mata. In Barahona's upstairs bedroom, agents found a small bag of cocaine in the mattress. Barahona and Medrano were arrested the same day.

Two days later, on January 27, 2012, agents searched the Hyattsville apartment. They found a vice press used to package drugs, heat sealer bags (also used to package drugs), cutting agents, baking pans with drug residue, and two digital scales used to weigh drugs. Forensic testing confirmed that a fingerprint found on one of the scales was Steele's, and that the scale contained cocaine and heroin residue.

C.

In February 2013, a federal grand jury issued a second superseding indictment, charging Barahona, Medrano, and Steele with conspiring to distribute more than five kilograms of cocaine and more than one kilogram of heroin, in violation of 21 U.S.C. §§ 841 and 846 (Count 1); and using a telephone in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 843(b) (Counts 5-8, 10, 12, and 15). The grand jury also charged Steele and Barahona with managing places used to distribute and store drugs, in violation of 21 U.S.C. § 856 (Counts 2 and 13); Steele and Barahona with engaging in interstate travel for narcotics activity, in violation of 18 U.S.C. § 1952 (Counts 3 and 14); Steele with possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841 (Count 4); Medrano with possessing with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 841 (Counts 9 and 11); and Barahona with possessing with intent to distribute more than 1 kilogram of heroin and 500 grams of cocaine, in violation of 21 U.S.C. § 841 (Count 16).

Barahona and Steele filed pretrial a motion to suppress evidence uncovered at Barahona's Gaithersburg residence and Steele's Hyattsville apartment, which the district court denied. The Defendants proceeded to trial, following which the jury found them guilty on all counts. The jury determined that

7

Barahona and Steele participated in a conspiracy to distribute more than five kilograms of cocaine and one kilogram of heroin, while Medrano conspired to distribute more than five kilograms of cocaine. The district court sentenced Barahona to 132 months' imprisonment; Medrano to 120 months' imprisonment; and Steele to 192 months' imprisonment. This timely appeal followed.

## II.

### A.

The Defendants challenge the district court's denial of their motion to suppress evidence recovered through the use of electronic interception of telephone conversations. Specifically, they claim that the government's wiretap applications did not satisfy the necessity requirement of 18 U.S.C. § 2518(3), and that the supporting affidavits contained material misstatements or omissions justifying a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

### 1.

In September 2011, during a court-authorized wiretap of drug dealer Kevin Walker's phone ("Target Telephone A" or "TTA"), law enforcement officers identified Mata as a Maryland-based cocaine supplier. After monitoring calls and conducting some physical surveillance over a period of weeks, officers stopped a car driven by Mata's girlfriend, Yacenia Beaver, on

October 5, 2011. Officers searched the car upon receiving consent, and discovered approximately 403 grams of heroin and $15,000 in cash. Subsequent interviews with Beaver and her children confirmed that Mata was a drug dealer who had dealings in Atlanta, but did not reveal the extent of Mata's operations in Maryland or the identity of his suppliers.

Following the above events, officers sought authorization to wiretap a cellular phone used by Mata ("Target Telephone C" or "TTC"). The supporting affidavit filed by Officer Richard Armagost disclosed the TTA wiretap, and set forth the basis for believing that Mata used TTC in his drug operation. Armagost explained why previous wiretaps had provided valuable, albeit limited, information. He also explained why other investigative techniques, such as confidential sources, controlled purchases, physical surveillance, and trash pulls, would not yield the information that officers were seeking. On October 7, 2011, the district court authorized the TTC wiretap, which ultimately captured Mata's calls with Barahona, among others.

As the investigation continued and Mata changed cell phones, investigators sought authorization to wiretap additional phones ("Target Telephones D through I" or "TTD through TTI"). Armagost's supporting affidavits for those wiretap applications reviewed the history of the investigation, explained why there was probable cause to believe that Mata was using the target

9

phones to further his drug dealings, and explained why techniques other than wiretapping would not yield information helpful to the investigation.

On November 29, 2011, the district court authorized the TTE wiretap, which captured calls with Steele. The district court later issued a "roving" order authorizing the wiretap of any phones Mata used over the next thirty days; those phones were TTG, TTH, and TTI. Based on an updated application, the court extended the TTG and TTI wiretaps through the time of the Defendants' January 2012 arrests.[1]

The Defendants joined in a motion to suppress the wiretap evidence, filed by Steele. Following a hearing, the district court denied the motion to suppress.

2.

In reviewing a denial of a motion to suppress, we review factual findings for clear error and legal conclusions de novo. United States v. Hampton, 628 F.3d 654, 658 (4th Cir. 2010). We review for abuse of discretion an authorizing court's determinations of necessity under 18 U.S.C. § 2518(3). United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007). Finally,

---

[1] Interception of TTD was quickly suspended because Mata stopped using that phone within a few days of the district court's order authorizing the wiretap. Interception of TTF never commenced because Mata stopped using that phone around the time the court authorized its interception.

10

we review the denial of a <u>Franks</u> hearing de novo.  <u>United States v. Allen</u>, 631 F.3d 164, 171 (4th Cir. 2011).

3.

To obtain authorization for a wiretap, the government must "show the 'necessity' of any wiretap application via a full and complete statement as to whether 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  <u>Wilson</u>, 484 F.3d at 281 (quoting 18 U.S.C. § 2518(3)).  The burden on the government, however, "is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents."  <u>Id.</u> (internal quotation marks omitted).  While the government

> cannot meet its burden with bare conclusory statements that normal techniques would be unproductive or mere boilerplate recitation of the difficulties of gathering usable evidence, it need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating [the] criminal enterprise or in gathering evidence such that wiretapping becomes reasonable, despite the statutory preference for less intrusive techniques.

<u>United States v. Galloway</u>, 749 F.3d 238, 243 (4th Cir. 2014) (internal quotation marks omitted).  The federal wiretap statute includes a "standing" requirement, permitting "[a]ny aggrieved person in any trial, hearing, or proceeding" to file a motion to "suppress the contents of any wire or oral communication"

11

alleged to have been unlawfully intercepted. 18 U.S.C. §
2518(10); see also 18 U.S.C. § 2510(11) (defining "aggrieved
person").

Assuming without deciding that the Defendants have standing
to challenge the wiretaps, their challenge fails. Beginning
with TTA, the government made an adequate showing of necessity.
The affidavit supporting TTA explained how "agents and officers
involved in this investigation have made extensive use of
information provided by . . . informants concerning the [Walker]
organization's drug distribution activities." J.A. 2728.[2]
Nevertheless, informants were unable to provide information
regarding Walker's sources of supply. The affidavit further
explained that, because "[Walker] is extremely suspicious" and
"has shown a pattern [of] utilizing other individuals to deliver
drugs on his behalf," investigators have been unable to arrange
controlled purchases from Walker. J.A. 2729. Moreover, the
affidavit explained, investigators' ability to conduct physical
surveillance has been limited by Walker's use of "lookouts" and
other counter-surveillance maneuvers. Walker was also careful
about what he discarded in the trash, as two trash pulls did not
yield any information helpful to the investigation. In light of

_____

    [2] Citations to the "J.A." refer to the Joint Appendix filed
by the parties in this appeal.

12

the affidavit's "fairly extensive discussions" of why other techniques would fail "to reveal the full scope of the organization," risked "reveal[ing] the existence of the ongoing investigation," or were "not practical under the circumstances," the district court did not abuse its discretion in authorizing TTA. Galloway, 749 F.3d at 243.

We also reject the Defendants' argument that the necessity explanation provided in the TTC affidavit "amounted to bare conclusory statements and boilerplate recitations that would more or less apply to any drug-trafficking investigation." Id. at 242. The affidavit supporting TTC explained that, although officers had interviewed Beaver and her children, their information was limited to "the storage and distribution of controlled substances [] and transportation of proceeds from some of Mata's customers." J.A. 1807. Moreover, because Mata was aware of Beaver's traffic stop, he was "not likely to engage in [further] criminal activities with" her. J.A. 1808. The affidavit further explained why physical surveillance would be insufficient, especially in light of Mata's observed counter-surveillance practices and the lack of an adequate place to mount cameras. As for trash pulls, the affidavit explained that, given the location of Mata's residence, trash searches were impractical. Although the Defendants take issue with the fact that the officers did not attempt all the alternative

13

investigative techniques discussed in their affidavit, § 2518(3) did not place that kind of burden upon them. See Wilson, 484 F.3d at 281 (stating that the government may obtain authorization for a wiretap if it explains why normal investigative procedures "reasonably appear to be unlikely to succeed if tried or [are] too dangerous" (quoting 18 U.S.C. § 2518(3)); see also United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977) ("[P]olice need not exhaust every conceivable technique before making [an] application for a wiretap."). Accordingly, the district court did not abuse its discretion in finding the TTC wiretap necessary under § 2518(3).

As for TTE through TTI, the Defendants claim that the government failed to satisfy the necessity requirement each time it sought a wiretap. Although later affidavits repeated relevant facts from earlier affidavits, this does not render the government's necessity explanations "boilerplate." United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995). The affidavits for TTE through TTI relayed the progress of the investigation, justifying the continued need for a wiretap. For example, the affidavit for TTE explained that Mata had changed residences following Beaver's arrest, detailed the difficulties of using Barahona or Santoyo-Villa to conduct controlled purchases, and explained that a recently arrested co-conspirator had refused to cooperate. The affidavit supporting the roving

14

order explained that Mata was changing cell phones "in a continued effort to engage in his illegal activities and to thwart law enforcement . . . ." J.A. 2155. The affidavit to renew TTG and TTI explained that law enforcement had used trash pulls and a pole camera, but that those techniques had provided only limited information. Cf. United States v. Blackmon, 273 F.3d 1204, 1208 (9th Cir. 2001) (reversing necessity finding where the wiretap application was a "carbon copy" of an earlier wiretap application targeting a different suspect); United States v. Carneiro, 861 F.2d 1171, 1180–81 (9th Cir. 1988) (same). Thus, in sum, we find no abuse of discretion in the district court's necessity determinations.

Finally, we reject the Defendants' claim that they are entitled to a Franks hearing. Franks "carved out a narrow exception to" the general rule that "[a]n accused is [] not entitled to challenge the veracity of a facially valid . . . affidavit." Allen, 631 F.3d at 171. To trigger that exception, "the accused must make a substantial preliminary showing that false statements were either knowingly or recklessly included in an affidavit supporting a search warrant and that, without those false statements, the affidavit cannot support a probable cause finding." Id. (emphasis in original).

The Defendants claim that they are entitled to a Franks hearing because the government failed to inform the district

15

court that: (1) the Mata investigation had spun off the Walker investigation; and (2) it had misidentified Steele as "David Lowell" in earlier wiretaps. As to the first claim, the government did not, as the Defendants claim, use the TTA wiretap to "mislead the court into thinking there was necessity as to Mata and his target telephone." Def. Br. at 46. Although the government stated in the TTC affidavit that the court had already authorized the TTA wiretap, it made clear that the goal of TTC was different: to "identify [Mata's] source of supply" and "identify other participants in the [Mata] organization." J.A. 1767; see also J.A. 1807 (TTC affidavit explained why traditional investigative methods were inadequate to understand "[Mata's] drug trafficking methods"). Moreover, the affidavit supporting the TTE wiretap made clear that "[a]gents commenced an investigation of [Mata]" after identifying Mata "during the [Walker] investigation." J.A. 1969. The affidavits, therefore, fully apprised the district court of the origins of the Mata investigation as well as its goals.

As to the second claim, the Defendants fail to demonstrate that the "David Lowell" omission was "material" to the district court's decision to authorize the wiretaps. See United States v. McKenzie-Gude, 671 F.3d 452, 462 (4th Cir. 2011) (explaining that, to obtain a Franks hearing, the accused must show that "omissions were material, i.e., rendered the affidavit unable to

16

support a probable cause finding" (internal quotation marks omitted)); see also United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearing."). To authorize the wiretaps, the district court needed to find probable cause that "particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(b). "What mattered for that purpose," as explained by the government, "was that Mata used his cell-phone to conduct his drug-trafficking operation, not with whom he spoke." Gov't Br. at 23.

Likewise, the alleged omission was not material to the district court's necessity determination. The Defendants argue that the government only learned of Steele's identity through physical surveillance. Thus, they claim, by omitting that Steele was misidentified on earlier wiretaps, the government was omitting the success of other, traditional investigative techniques. As pointed out by the government, however, it only learned of its misidentification after setting up surveillance based on information gleaned from a wiretap. Accordingly, as claimed by the government, traditional techniques alone were insufficient to identify all of Mata's co-conspirators. The district court, in short, did not err in denying the Defendants' motion to suppress wiretap evidence.

17

B.

Barahona and Steele contend that the district court erred in denying their motion to suppress evidence uncovered at Barahona's Gaithersburg residence and Steele's Hyattsville apartment. They claim that the search warrants were not supported by probable cause, and were so facially deficient in establishing probable cause that the good-faith exception does not apply.[3]

Pursuant to well-established law, a warrant must be supported by probable cause. United States v. Montieth, 662 F.3d 660, 664 (4th Cir. 2011). The probable cause determination "is a practical, common-sense decision whether, given all the circumstances set forth in the affidavit [] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (internal quotation marks omitted). "[T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Allen, 631 F.3d 164, 173 (4th Cir. 2011) (internal quotation marks omitted). "In assessing the

---

[3] The Defendants also challenge a search conducted at an apartment in Upper Marlboro, Maryland. The government, however, did not introduce any evidence from the Upper Marlboro apartment at trial, and thus we need not decide whether that search was lawful.

18

probable cause determination," this Court "accord[s] great deference to the issuing judge's assessment of the facts presented," id., and limits its inquiry "to whether there was a substantial basis for determining the existence of probable cause," Monteith, 662 F.3d at 664 (internal quotation marks omitted).

Applying the above standard, the issuing judge properly concluded that there was a "fair probability" of discovering contraband or evidence of a crime at Barahona's Gaithersburg home. In a January 13, 2012 affidavit, Officer David Papalia explained in detail Barahona's involvement in Mata's drug operation, describing, for example, Barahona's role as a driver in a thwarted October 2011 drug run to North Carolina. In addition, the affidavit described a phone call between Mata and a cocaine customer, in which Mata agreed to sell the customer three and a half kilograms of cocaine and told the customer to meet him at Barahona's house. The affidavit also detailed a January 6, 2012 call between Mata and Barahona, in which Barahona asked Mata for money and told Mata to bring him air fresheners because "you won't believe the smell" at the house. Surveillance confirmed that Mata went to Barahona's house within hours after the phone call.

Barahona argues that the above facts cannot establish probable cause because they do not establish a nexus between his

house and evidence of his involvement in Mata's drug operation. He argues, at bottom, that there was no direct evidence that drugs would be found at the house. As explained by this Court, however, "we have upheld warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." United States v. Williams, 548 F.3d 311, 319 (4th Cir. 2008); see also United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993) ("[A] warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location.").

The affidavit here established the requisite suspicion regarding Barahona's house. The affiant detailed Barahona's role in Mata's drug activities, and asserted his experience with drug dealers storing evidence in their homes. See J.A. 2592 ("[I]t is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence . . . ."). Additionally, the affiant offered facts from which a reasonable judge could find a "fair probability" that drugs would be present in Barahona's house: (1) Mata instructed a customer to

20

meet him there; and (2) Barahona asked Mata to bring him air fresheners, implying that the men were trying to conceal the smell of drugs at the house.  This was simply not a case where evidence failed to "connect[] the drug activity to the residence."  Lalor, 996 F.2d at 1583.

Likewise, the issuing judge properly concluded that there was a "fair probability" of discovering contraband or evidence of a crime at Steele's Hyattsville apartment.  In a January 27, 2012 affidavit, Armagost described a phone call between Steele and Mata, in which they discussed whether Mata would leave a bag containing drugs at the apartment.  Agents later confirmed through GPS that Mata was at or near the Hyattsville apartment during the call.  The affidavit also described Steele's subsequent dealings with Mata, as well as Steele's connections to the Hyattsville apartment.  In particular, Steele drove a vehicle registered to that address and, as of the time of his arrest, had a key to the apartment building.  Cf. United States v. Grossman, 400 F.3d 212, 218 (4th Cir. 2005) ("[I]t is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key.").  Additionally, officers saw Steele's car in the apartment's parking lot.  In short, the above evidence provided a sufficient basis from which the issuing judge could infer that evidence of drug activity would be found at the Hyattsville apartment.

21

In any event, even if the search warrants were deficient, the district court properly denied suppression pursuant to the good-faith exception to the exclusionary rule. Pursuant to that exception, "the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 131 S. Ct. 2419, 2428 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). "[T]he good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." United States v. Stephens, 764 F.3d 327, 336 (4th Cir. 2014) (internal quotation marks omitted). Accordingly, the good faith exception does not apply when, for example, a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923; see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) (threshold for establishing that a warrant was facially deficient is a "high one").

The affidavits at issue here were not so "bare bones" as to render officers' reliance on them unreasonable. United States v. Wilhelm, 80 F.3d 118, 122 (4th Cir. 1996). As explained above, the affidavits detail Barahona and Steele's involvement in Mata's drug-trafficking operation, and offer specific facts

22

linking that operation to Barahona's house and Steele's apartment. Cf. id. at 123 (concluding that the good faith exception did not apply where the affiant did little more than assert that probable cause existed). Accordingly, because the good faith exception applies, the district court did not err in denying Barahona and Steele's motion to suppress.

C.

Barahona and Medrano argue that there was a material variance between the charged conspiracy and the proof presented at trial, and relatedly, that they were entitled to a multiple-conspiracies instruction.

1.

The court typically reviews de novo whether a material variance occurred. See United States v. Ford, 88 F.3d 1350, 1360 (4th Cir. 1996); see also United States v. Malloy, 568 F.3d 166, 177 (4th Cir. 2009). Where, however, the defendant failed to preserve his variance claim below, the court reviews only for plain error. United States v. Jeffers, 570 F.3d 557, 567 (4th Cir. 2009).

Here, Medrano preserved his variance claim by moving for a judgment of acquittal and, later, for a new trial. Accordingly, his variance claim is subject to de novo review. Barahona's variance claim, however, is subject to plain error review, as he did not claim a variance below.

23

As for claims of instructional error, the court typically reviews for abuse of discretion the district court's decision not to give a particular jury instruction. United States v. Bartko, 728 F.3d 327, 343 (4th Cir. 2013). Where, as here, however, the defendants propose a particular jury instruction but do not object to the failure to give that instruction, they fail to preserve their instructional error claim, and plain error review applies. United States v. Nicolaou, 180 F.3d 565, 569 (4th Cir. 1999).

2.

"In general, a 'variance' occurs when the evidence at trial establishes facts materially different from those alleged in the indictment." United States v. Kennedy, 32 F.3d 876, 883 (4th Cir. 1994). In a conspiracy case, "a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." Id. "The question whether the evidence shows a single conspiracy or multiple conspiracies . . . is one of fact and is properly the province of the jury." United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988). "Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." Id.

24

There is such an overlap here. The evidence at trial showed, for example, that both Barahona and Medrano made supply runs on Mata's behalf. Likewise, both men obtained cocaine from Mata to resell, with Mata fronting them the drugs and then collecting payment later. Barahona and Medrano also aided Mata in other ways: Barahona permitted Mata to store, cut, and repackage drugs in the basement of his home, while Medrano helped arrange for Stotz to make the Atlanta drug runs and sold Mata a firearm for his protection. Cf. United States v. Bollin, 264 F.3d 391, 405–06 (4th Cir. 2001) (the jury's finding of a single conspiracy was supported by substantial evidence, despite the fact that co-conspirators played different roles in the conspiracy). Finally, Medrano was slated to receive drugs from a shipment that Mata planned to store and repackage in Barahona's basement. Cf. United States v. Banks, 10 F.3d 1044, 1054–56 (4th Cir. 1993) (the jury could reasonably find a single conspiracy based on "the interdependence of participants" in a drug-trafficking venture). Based on the above facts, the jury could reasonably find Barahona and Medrano engaged in a single conspiracy. See Bollin, 264 F.3d at 405 ("[T]he finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the Government, would not allow any reasonable juror to reach such a verdict.").

25

In the face of the above evidence, Barahona and Medrano claim that there was a variance because the indictment charged a conspiracy to traffic in cocaine and heroin, whereas the proof at trial established only that they dealt in cocaine. As explained in Bollin, however, "even if the evidence established separate conspiracies, a variance is grounds for reversal only if it infringed the defendant's substantial rights and thereby resulted in actual prejudice." Id. at 406 (internal quotation marks omitted). Medrano cannot establish prejudice because the jury's verdict against him rested on his participation in a conspiracy to distribute cocaine, not heroin. The jury was asked to determine whether Medrano was guilty of conspiracy to distribute and possess with intent to distribute cocaine and, if so, how much cocaine was attributable to him. It was not asked to determine whether Medrano distributed heroin or how much heroin was attributable to him. As for Barahona, because he does not dispute that the evidence was sufficient to prove that he conspired to distribute cocaine, any factual insufficiency as to heroin would not require reversal of his conspiracy conviction. See Griffin v. United States, 502 U.S. 46, 56–57 (1991) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." (internal quotation marks omitted)).

In any event, the evidence was sufficient to link Barahona to Mata's heroin-trafficking activities. As explained above, Barahona permitted Mata to use his basement to cut and repackage a drug shipment, which included more than a kilogram of heroin. Although Barahona indicates that he did not know Mata's shipment would include heroin, the jury could have reasonably rejected that contention. The government presented evidence that Barahona had seen drugs in the basement on a previous occasion, and that among the items seized there were drug-packaging materials testing positive for heroin. Based on this evidence, the jury could have reasonably inferred, beyond a reasonable doubt, that Mata had brought heroin to Barahona's house on other occasions, and that Barahona was aware of Mata's heroin dealings. Thus, in sum, Barahona and Medrano's variance claim fails.

Turning to Barahona and Medrano's instructional error claim, "[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." Bartko, 728 F.3d at 344 (internal quotation marks omitted). "And, even if one overarching conspiracy is not evident, the district court's failure to give a multiple conspiracies instruction is reversible error only when the defendant suffers substantial

27

prejudice as a result." Id. In other words, "the evidence of multiple conspiracies [must have been] so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." Id. (emphasis in original) (internal quotation marks omitted).

According to Barahona and Medrano, the lack of evidence that they were involved in or knew about Mata's heroin dealings entitled them to a multiple-conspiracies instruction. But, even assuming they were entitled to this instruction, the district court's failure to give it did not cause them substantial prejudice. As explained above, the verdict form for Medrano only permitted a conspiracy conviction based on cocaine distribution. As for Barahona, there was sufficient circumstantial evidence linking him to Mata's heroin dealings. Moreover, the district court instructed the jury to consider each defendant individually for purposes of determining guilt and drug quantities. In this way, the district court ensured that the jury would not find a defendant guilty based merely on the activities of another defendant. Cf. Jeffers, 570 F.3d at 567 ("Error will be found in a conspiracy instruction if the proof of multiple conspiracies was likely to have confused the jury into imputing guilt to [the defendant] as a member of one conspiracy because of the illegal activity of members of the

28

other conspiracy." (internal quotation marks omitted)). The district court, therefore, did not commit reversible error in declining to give a multiple-conspiracies instruction.

D.

Steele asserts that he is entitled to a new trial because he was unable to recall two government witnesses, David Ware and Michael Margulis. He claims that his inability to recall Ware violated his right to confrontation, while his inability to recall Margulis resulted in a Brady violation.

1.

On March 8, 2013, the government called Ware, a Utah-based government contractor who translated recorded phone calls, to testify as an expert witness. Among the calls Ware translated was a December 6, 2011 call, in which Santoyo-Villa and Mata used the Spanish word "carros," which literally means "cars." Santoyo-Villa and Mata testified, however, that, in the context of their conversations, "carros" meant "kilos." Accordingly, Ware translated the word "carros" as kilos. The parties eventually stipulated that, in the December 6 call, "the word used by the speaker in Spanish that was translated as kilos was the word carros." S.A. 272–73.[4]

---

[4] Citations to the "S.A." refer to the Supplemental Joint Appendix filed by the parties in this appeal.

Despite the above stipulation, Steele requested that the district court continue the trial so that he could recall Ware and question him about the December 6 call. The court denied the request, reasoning that the parties had "thoroughly brought to the attention of the jury that the Spanish word used was carros, not kilos." S.A. 270. The court also denied Steele's subsequent motion for a new trial based on translation issues, again reasoning that his concerns had been "amply developed before the jury and the jury was able to make its own determinations with respect to any challenges to the interpretation of transcripts." S.A. 292–93.

On April 4, 2013, the government called canine handler Margulis to testify about the January 25, 2012 searches of Barahona's house and the vehicle used to transport drugs there. On cross-examination, Steele's counsel went beyond the scope of direct and asked Margulis whether he had conducted a dog sniff at the Hyattsville apartment. Margulis indicated that his dog had alerted during a scan of the Hyattsville apartment, but that he would need to review his report to provide more details. At a bench conference, Steele's counsel complained that she had not been provided with Margulis' report. Although questioning whether the report would be more "bad evidence" for Steele, the district court agreed that Margulis would be subject to recall

after the government gave the report to defense counsel.  S.A. 163-64.

The government located the report soon thereafter, and Steele's counsel recalled Margulis.  Margulis testified that the dog had alerted in the hall and bedroom of the Hyattsville apartment, and that, to his best recollection, he had not conducted a scan of Steele's car in the apartment parking lot. The court excused Margulis after his testimony.

The next day, on April 5, 2013, the government gave Steele an additional report indicating that, on January 27, 2012, Margulis conducted a scan of the car Steele was driving at the time of his arrest, and that the dog did not alert.  Steele's counsel did not advise the government until April 10, 2013, five days later, however, that she wished to recall Margulis.  By that time, Margulis had left on a previously scheduled vacation to Mexico and was not available for recall.

Steele moved for a mistrial, which the district court denied.  The court reasoned that the answer to the only question Steele wished to pose—whether dogs alert to latent odors when drugs are no longer present—was likely "it [] depends," and that the issue was not "of great significance to this case."  S.A. 250-52.  The court denied Steele's post-trial motion raising the same issue.  In any event, Steele's counsel introduced the

31

result of the January 27 car scan by cross-examining Armagost, and later used that testimony in her closing argument.

2.

We review for abuse of discretion limitations on the defense case that are alleged to violate the Confrontation Clause. See, e.g., United States v. Sterling, 724 F.3d 482, 516 (4th Cir. 2013); see also United States v. Williams, 445 F.3d 724, 738–39 (4th Cir. 2006) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (internal quotation marks omitted)). Likewise, we review for abuse of discretion the denial of a new trial based on a Brady violation, reviewing de novo the legal question of whether there was indeed a Brady violation. United States v. Horton, 693 F.3d 463, 470 (4th Cir. 2012).

3.

The district court did not abuse its discretion in denying Steele a continuance to recall Ware. As we have recognized, denial of a motion for continuance may, "under certain circumstances, implicate a defendant's right to present a defense or to confront the witnesses against him." Williams, 445 F.3d at 739–40. In particular, denial of a continuance may implicate the confrontation right when the defendant is

32

prevented from pursuing a meaningful line of inquiry. See id. at 740 (no abuse of discretion in denying a continuance where there was "nothing new" in the testimony the defendant sought to elicit, or where the denial prevented the defendant from presenting "cumulative evidence").

Steele's desire to question Ware about the Spanish word "carros" used in the December 6 call is not such a meaningful line of inquiry. As found by the district court, Steele "thoroughly brought to the attention of the jury that the Spanish word used [in the December 6 call] was carros, not kilos." S.A. 270. As indicated above, the parties stipulated that the Spanish word "that was translated as kilos was the word carros." S.A. 272–73. Moreover, Steele's counsel reminded the jury of the parties' stipulation during closing argument.

To the extent Steele argues that the court deprived him of an opportunity to probe Ware's potential bias, this argument must be rejected. As pointed out by the government, defense counsel elicited testimony from Ware that the U.S. Drug Enforcement Administration ("DEA") was one of his company's biggest clients, and that DEA agents provided the company with call summaries and identified call participants. In addition, Steele argued during closing that the jury should give less credence to Ware's testimony given his company's relationship to the DEA. Accordingly, the government is correct that any

33

further suggestion of bias would have been cumulative. Cf. Williams, 445 F.3d at 740 (because the defendant was able to explore the relevant issue elsewhere in trial, his "inability to impeach [a witness] to a somewhat greater degree [cannot] be viewed as a violation of his constitutional rights").

As to Margulis, the district court was correct in finding no Brady violation. To establish a Brady violation, "the burden rest[s] on [the defendant] to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." United States v. Wilson, 624 F.3d 640, 661 (4th Cir. 2010) (internal quotation marks omitted) (emphasis added). "Evidence is material if it is likely to have changed the verdict." Id. (internal quotation marks omitted).

Steele cannot show that questioning Margulis about whether dogs alert to latent odors would have likely had any effect on the verdict in his case. Indeed, he does not argue that this line of questioning would have exculpated him, or that it would have impeached Margulis. Steele instead contends that, by questioning Margulis, he would have been able to impeach Mata, who testified that he had put kilograms of drugs in Steele's car.

34

But this assumes that Margulis would have testified that a trained dog would have likely alerted to a car that formerly contained drugs. And, as indicated by the district court, there was no basis for believing that Margulis would give such testimony. See S.A. 251 ("I could almost guarantee you that the question of whether a dog is going to hit on a car that's had drugs in it . . . depends on whether any drug residue is left or not."). In any event, even if Margulis had testified as Steele hoped, his testimony would not have undermined the other considerable evidence presented by the government, including phone calls in which Steele negotiated drug deals, surveillance from a drug deal in New York, and a digital scale bearing Steele's fingerprint which was recovered from the Hyattsville apartment. Cf. Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (per curiam) (no reversible Brady error where the case against the defendant was "overwhelming"). Steele, in short, was not entitled to a new trial based on his inability to recall Ware or Margulis.

## E.

The Defendants claim that the district court abused its discretion in denying their request to remove two jurors based on alleged incidents involving Barahona. According to the Defendants, the jurors involved in those incidents were actually biased. In the alternative, the Defendants argue for a

35

"presumption of prejudice" under Remmer v. United States, 347 U.S. 227 (1954), or an "implication of bias" pursuant to Person v. Miller, 854 F.2d 656 (4th Cir. 1988).

1.

On March 29, 2013, the third day of trial, the district court informed the parties that a juror had the impression Barahona had followed her down a courthouse escalator and taken a picture of her with a cellphone. The juror also thought that a woman outside the courthouse had taken pictures of her. Acknowledging that the juror might have been mistaken, the district court "[didn't] want to make a deal out of it with the juror," but admonished the parties not to take the escalators used by jurors and not to take pictures with their cell phones. J.A. 511.

The government suggested that the court determine whether Barahona had taken the picture and, if not, inform the juror that she had been "confused." J.A. 511. Accordingly, the court asked Barahona's counsel to question him about the alleged incident. A short time later, counsel reported that she had checked Barahona's phone, and that there were no pictures of any jurors. The court did not conduct any further inquiry of the juror, nor did the Defendants request that the court do so.

Four days later, on April 5, 2013, the district court informed the parties that another juror expressed concern that

Barahona had followed her home upon leaving the courthouse. To avoid "any apprehension by jurors that they're being followed or intimidated," the district court ordered the Defendants to depart the courthouse each day fifteen minutes after the jury. J.A. 1057. Following the district court's order, the Defendants requested that the court voir dire the juror. After confirming through Barahona's counsel that he had not followed the juror, the court determined that it—but not the parties' attorneys—would conduct the inquiry.

Upon questioning, the juror stated that, while she had seen Barahona's van, she "[couldn't] truly say he was following [her]." J.A. 1061. Additionally, she stated that the incident did not impede her ability to be a fair juror, and that she had not discussed the incident with other jurors. The court told the juror that seeing Barahona's car was likely "coincidental," but explained that the Defendants would now be departing fifteen minutes after the jury to avoid any future encounters. J.A. 1062. The court verified that this measure addressed the juror's concerns, and twice reminded her not to talk with the other jurors about what they had discussed. The Defendants did not ask the court to make further inquiries, nor did they move to excuse the juror.

On April 11, 2013, Steele's counsel reported to the court that, an hour after court recessed the day before, she saw the

same juror the court had voir dired "sitting in the backseat of her car with the door open and on the phone and kind of looking around like she was freaked out." J.A. 1426. Counsel brought the incident to the court's attention because "it was 94-degrees [out], so [she] just thought it was strange." J.A. 1426. The court indicated that it had heard no additional concerns from the juror, and the Defendants neither moved to excuse the juror nor asked the court to inquire further.

On April 17, 2013, just prior to the commencement of deliberations, the Defendants moved to exclude the two jurors involved in the above incidents. The Defendants argued that the two jurors had "shown some bias and concern," and that they could be replaced with alternates. J.A. 1445. Stating that the jurors "didn't reflect any bias," and that it had "addressed the issue long ago," the district court denied the motion. J.A. 1445.

2.

We typically review for abuse of discretion the district court's handling of juror-intimidation allegations. United States v. Baptiste, 596 F.3d 214, 221 (4th Cir. 2010). Where, however, the defendants fail to raise the issue at trial, we review only for plain error. Id.

The government urges us to apply plain error review as to the March 29 and April 11 incidents, as the Defendants did not

38

request additional voir dire. The Defendants, for their part, seem to assume that the abuse of discretion standard applies. We need not decide which standard of review controls, as the Defendants' challenges fail even under the more lenient abuse of discretion standard.

3.

As an initial matter, we reject the Defendants' claim of actual bias. "[T]he trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor . . . ." Wainwright v. Witt, 469 U.S. 412, 429–30 (1985) (internal quotation marks omitted). That being said, the trial court must, as a matter of law, "exclude veniremen who cannot be impartial." United States v. Turner, 389 F.3d 111, 117 (4th Cir. 2004). "[A] juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court . . . ." Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984). "[T]he burden of proving partiality is upon the challenger." Turner, 389 F.3d at 117–18 (internal quotation marks omitted).

The Defendants simply did not meet that burden here. As to the first juror, there is nothing in the record to indicate that she could not be impartial following the March 29 incident. Indeed, the Defendants never even requested that the court question the juror. While the district court might have

39

summoned the juror anyway to explain that Barahona had not taken any pictures of her, the decision not to do so was a sound exercise of its "wide discretion in handling matters relating to . . . the integrity of the jury." United States v. Johnson, 657 F.2d 604, 606 (4th Cir. 1981). The district court may have reasonably concluded, for instance, that individualized voir dire would be counterproductive, and "unnecessarily highlight the matter in the eyes of the juror[]." United States v. Mack, 729 F.3d 594, 606 (6th Cir. 2013); see also United States v. Stafford, 136 F.3d 1109, 1113 (7th Cir. 1998) (recognizing that individual questioning in the middle of a trial may "unsettle the jury").

As to the second juror, the district court asked her whether the incident with Barahona caused her "any concern as to whether [she] can continue to be a fair juror in this case," and the juror answered clearly, "[n]o, it does not." J.A. 1061. The Defendants attempt to argue the juror was nevertheless biased by relying on the April 11 incident. But, as recognized by the district court, the juror never reported any additional concerns to the court, and the April 11 incident might have had nothing to do with the trial. The district court, therefore, did not err in failing to find actual bias.

Turning to the Defendants' argument for a "presumption of prejudice," this Court has explained that, "[b]ecause the

40

potential for mischief is so great when a third party establishes private, extrajudicial contact with a juror, . . . 'any private communication [or] contact . . . with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial . . . .'" <u>Fullwood v. Lee</u>, 290 F.3d 663, 678 (4th Cir. 2002) (quoting <u>Remmer</u>, 347 U.S. at 229). The <u>Remmer</u> presumption, however, is "not one to be casually invoked." <u>Baptiste</u>, 596 F.3d at 221 (internal quotation marks omitted). To trigger the presumption, "the defendant bears the initial burden of establish[ing] both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." <u>Id.</u> (internal quotation marks omitted). In determining whether the defendant has met his burden, the court "refer[s] back to the factors the Supreme Court deemed important in <u>Remmer</u> itself": "any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury." <u>Barnes v. Joyner</u>, 751 F.3d 229, 245 (4th Cir. 2014) (internal quotation marks omitted).

Applying <u>Remmer</u>, the March 29 incident did not trigger a presumption of prejudice because it did not "reasonably draw into question the integrity of the verdict." <u>Baptiste</u>, 596 F.3d at 221. The Defendants made no effort to meet their threshold burden. The only "evidence" of bias came from a brief statement

41

by the district court outside the presence of the jury that one juror had reported an incident. Nor did the April 11 incident trigger the Remmer presumption. As indicated above, the Defendants have not shown that the juror's behavior on that day had anything to do with the trial, let alone that it stemmed from an "unauthorized contact" with Barahona. Id. Indeed, the Defendants merely speculate that the juror was upset because of an incident with Barahona. Cf. United States v. Heater, 63 F.3d 311, 321–22 (4th Cir. 1995) (concluding that "defense counsel's declaration of improper jury contact was nothing more than a bald assertion," and that the "mere proffer without further support is not enough to create a question about improper jury tampering").

As to the November 5 incident, even assuming the Defendants met their initial burden "of establish[ing] both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict," Baptiste, 596 F.3d at 221 (internal quotation marks omitted), additional questioning of the juror established that the contact was "harmless to the defendant[s]." United States v. Lawson, 677 F.3d 629, 641 (4th Cir. 2012). As already explained, the juror indicated that she was not certain Barahona had followed her, that the fifteen-minute delay for the Defendants' departure allayed any concerns she had, and that she

42

could continue to be a fair juror. Thus, the Defendants' presumed prejudice argument fails.

Finally, as for the Defendants' argument for an "implication of bias," this Court has stated that "the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Person, 854 F.2d at 664. Implied bias might arise, for example, when "the juror is an actual employee of the prosecuting agency, [when] the juror is a close relative of one of the participants in the trial or the criminal transaction, or [when] the juror was a witness or somehow involved in the criminal transaction." United States v. Umana, 750 F.3d 320, 341 (4th Cir. 2014) (internal quotation marks omitted); see also Dyer v. Calderon, 151 F.3d 970, 982 (9th Cir. 1998) (applying implied bias doctrine where the juror lied during voir dire to keep her status as a juror and "secure the right to pass on [the defendant's] sentence").

Applying the above standard, the two jurors had no pre-existing relationships or experiences suggesting a risk of partiality. Nor were the alleged incidents with Barahona the kind of "extreme situations" warranting relief. Person, 854 F.2d at 664. Rather, as recognized by the district court, they

43

were likely misunderstandings addressed through practical measures, including having the Defendants not take the escalators used by jurors and having the Defendants leave the courthouse fifteen minutes after the jury. Thus, we discern no error or abuse of discretion in the district court's denial of the Defendants' request to substitute alternates for the two belatedly-challenged jurors.

### F.

Barahona argues that the district court clearly erred in applying a two-level enhancement to his base offense level due to co-conspirator Mata's possession of a firearm.

### 1.

Barahona's presentence investigation report ("PSR") calculated a total offense level of 36. The PSR calculated a base-offense level of 34 derived from the quantity of drugs attributable to Barahona. It then added two levels under U.S.S.G. § 2D1.1(b)(1) because Mata's possession of a handgun was "in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable by [] Barahona." J.A. 3039. Overruling Barahona's objection to the two-level enhancement, the district court calculated an advisory guidelines range of 188 to 235 months, and ultimately sentenced Barahona to 132 months.

2.

Section 2D1.1(b)(1) permits a two-level increase in a defendant's base offense level "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The two-level enhancement "'should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.'" United States v. Gomez-Jimenez, 750 F.3d 370, 381 (4th Cir. 2014) (quoting U.S.S.G. § 2D1.1 cmt. n.11(A)). In particular, with respect to conspiracy cases, "weapons carried by a member of a conspiracy are attributable to a co-conspirator when 'under the circumstances of the case, it was fair to say that it was reasonably foreseeable to [the defendant] that his co-participant was in possession of a firearm.'" Id. (quoting United States v. Kimberlin, 18 F.3d 1156, 1160 (4th Cir. 1994)). "'[A]bsent evidence of exceptional circumstances, . . . it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.'" Kimberlin, 18 F.3d at 1160 (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991)). In considering whether a co-defendant's possession of a weapon was foreseeable to the defendant, this Court reviews the

district court's findings of fact for clear error. United States v. McAllister, 272 F.3d 228, 234 (4th Cir. 2001).

Applying the above standard, the district court did not clearly err in imposing the two-level enhancement based on Mata's possession of a firearm. Contrary to Barahona's assertion that "the firearm had [nothing] to do with" Mata's drug trafficking activities, Def. Br. at 86, Mata testified at trial that he had purchased the handgun for protection from a drug supplier named Berna, with whom he had quarreled over a drug debt. Moreover, agents recovered the gun in the car that Mata had driven to Barahona's house, where he had planned to store and cut the latest shipment of cocaine and heroin.

In any event, there were no "exceptional circumstances" rendering Mata's possession of the handgun unforeseeable to Barahona. Kimberlin, 18 F.3d at 1160 (internal quotation marks omitted). Barahona seizes on Mata's statement at trial that the handgun "wasn't to protect the drugs" but rather himself. J.A. 621. Mata made clear, however, that he "always" carried the gun, including when he was transporting drugs. J.A. 621–22. Barahona also argues that he and Mata never discussed firearms, and that he was unaware Mata even possessed a gun. But the simple fact that Mata never discussed the gun with Barahona does not make his possession of the gun unforeseeable; nor must Barahona have been actually aware of the gun for the two-level

46

enhancement to apply.  Cf. Kimberlin, 18 F.3d at 1159–60 (actual knowledge not required where there is a "strong showing of foreseeability").

Finally, to the extent Barahona argues that the two-level enhancement was improper because it was not applied to some of his co-defendants, this argument must be rejected.  Barahona cites no authority indicating that failure to apply an enhancement to one conspirator bars application of that enhancement to other conspirators.  Indeed, in "jointly undertaken criminal activity," "relevant conduct is not necessarily the same for every participant," and thus sentencing enhancements may apply to one conspirator but not another. U.S.S.G. § 1B1.3 cmt. n.2(B).  In sum, the district court's application of the two-level enhancement under § 2D1.1(b)(1) did not result from a clear error of fact or otherwise an abuse of discretion.

## III.

For the foregoing reasons, the judgments are

AFFIRMED.